**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **MICAH ASHER JEFFERSON,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 3:19-CV-01079-NJR** |
| **CRAIG ASSELMEIER,** | |
| **Defendant.** | |

# <u>MEMORANDUM AND ORDER</u>

**ROSENSTENGEL, Chief Judge:**

Pending before the Court is a Motion for Summary Judgment filed by Defendant Craig Asselmeier, D.M.D. (Doc. 86). Plaintiff Micah Jefferson filed a timely response to the motion (Docs. 88, 89) to which Defendant Asselmeier filed a timely reply (Doc. 91). For the reasons set forth below, the motion is granted.

## INTRODUCTION

On October 3, 2019, Plaintiff Micah Jefferson, a prisoner in custody of the Illinois Department of Corrections ("IDOC"), filed this action *pro se* pursuant to 42 U.S.C. § 1983 alleging his constitutional rights were violated while incarcerated at Menard Correctional Center ("Menard") (Doc. 1). While initially proceeding *pro se*, counsel was appointed for Jefferson on May 28, 2021 (Doc. 67). When he filed the Complaint, Jefferson resided at Lawrence Correctional Center ("Lawrence") (Doc. 1), but he is currently incarcerated at Western Illinois Correctional Center ("Western")[1]. All allegations concern dental treatment

---

[1] *See* https://www2.illinois.gov/idoc/Offender/Pages/InmateSearch.aspx (last visited Sept. 12, 2022).

during his incarceration at Menard, which spanned from 2017 to 2019 (Docs. 1, 87). Jefferson proceeds on a single count alleging that Dr. Asselmeier, beginning in 2018, acted deliberately indifferent to his cracked teeth and associated pain in violation of the Eighth Amendment. On September 18, 2020, Jefferson filed a Motion for Summary Judgment (Doc. 48), which this Court denied (Doc. 66).

At the time of the underlying events, Dr. Asselmeier, a licensed dentist, worked at Menard (Doc. 87). He has been employed at Menard as a dentist since 2013 (*Id*.) In his motion for summary judgment, Dr. Asselmeier argues that Jefferson cannot set forth any evidence demonstrating a serious dental need or any deliberate indifference to such need (Doc. 86). Moreover, according to Dr. Asselmeier, Jefferson cannot show any genuine dispute as to the material facts needed to support a claim of deliberate indifference (*Id*.).

## FACTUAL BACKGROUND

Before meeting with Dr. Asselmeier, Jefferson resided at Stateville Correctional Center ("Stateville") where a non-party dentist evaluated his teeth and noted that three teeth—the upper left first molar (#14), lower left third molar/wisdom tooth (#17), and lower left second molar (#18)—needed oral surgery (Doc. 87-2, p. 1). The non-party dentist also documented that the upper right lateral incisor (#7) and upper left third molar/wisdom tooth (#16) were operative (*Id*.).[2] Shortly after this visit, Jefferson sent a request to the Stateville dental department stating, "my tooth broke," and he was

---

[2] According to Dr. Asselmeier, the term "oral surgery" signals that a tooth should be extracted and the term "operative" suggests that the tooth should be filled or restored (Doc. 53-2, ¶ 4).

scheduled for another visit the next day, although no documentation of that appointment exists in his dental record (*Id.* at p. 2).

About a month later, on December 20, 2017, Dr. Asselmeier reviewed Jefferson's chart and x-rays upon Jefferson's transfer to Menard (*Id.* at p. 3; Doc. 53-2, ¶ 6). The dental record contains a stamp indicating that Dr. Asselmeier would await a request for appointment (Doc. 87-2, p. 3). Jefferson met with Dr. Asselmeier for the first time on January 31, 2018, and after an oral examination, Dr. Asselmeier placed Jefferson on the filling list for his upper right first bicuspid (#5), #7, and his upper left central incisor (#9) (*Id.*). For their next visit, Dr. Asselmeier scheduled an extraction of teeth #17 and #18 instructing Jefferson to write a request if his teeth bothered him before the extraction (*Id.*). Notably, the dental records do not reflect any complaints about other teeth like the upper left first premolar/first bicuspid (#12) or #16 (*Id.*).

On February 14, 2018, Dr. Asselmeier surgically extracted teeth #17 and #18 after obtaining Jefferson's consent (Doc. 87-2, p. 3; Doc. 53-2, ¶ 8). Dr. Asselmeier then prescribed Tylenol and Motrin for pain and an antibiotic (*Id.*). Eight days later, Jefferson saw Dr. Asselmeier for a follow-up appointment after Jefferson submitted a request for dental care (known as a kite request) due to pain after the extractions (Doc. 87-2, p. 3; Doc. 53-2, ¶ 9). In response to these complaints, Dr. Asselmeier prescribed Motrin, Tylenol, and an antibiotic (*Id.*). Due to lockdowns at Menard, three follow-up appointments, originally scheduled for February 28, 2018, March 7, 2018, and March 14, 2018, were rescheduled (Doc. 87-2, p. 3). At Menard, prisoners who require emergent dental care are typically treated despite the lockdown (Doc. 53-2, ¶ 11). Jefferson's dental records do not indicate

that he either requested or received emergency dental treatment during any of the aforementioned lockdowns (Doc. 87-2). As another option to address ongoing toothaches or dental issues, prisoners may report to nurse sick call any day of the week to receive pain medication (Doc. 53-2, ¶ 12). While waiting for his follow-up dental appointment, Jefferson did not report to sick call for dental issues (Doc. 87-1, pp. 66-67; Doc. 87-2).

At his follow-up appointment on March 21, 2018, Jefferson described thermal sensitivity and soreness near a tooth neighboring the extraction site (Doc. 87-2, p. 3). Dr. Asselmeier noted several observations: the bone healed somewhat unevenly in the area of tooth #18, the bone appeared fully covered with no sharpness, and the lower left first molar (#19) was possibly thermally sensitive (Doc. 87-2, p. 3; Doc. 53-2, ¶ 13). Overall, Dr. Asselmeier estimated that the healing development fell within normal limits (*Id.*). Dr. Asselmeier reassured Jefferson that healing and allowing the bone to remodel in the extraction site takes time, and he prescribed Tylenol to Jefferson to manage pain (*Id.*) At this time, Jefferson remained on the filling list[3] (*Id.*).

Almost six months later, a non-party dentist, Dr. Andrew Wyshnytzky, placed composite fillings on several portions of teeth #7 and the upper right central incisor (#8) and noted that #5, the upper right canine (#6), and the lower right first bicuspid (#28) would be filled at another visit[4] (Doc. 87-2, p. 3; Doc. 53-2, ¶ 15). Ten days later, on September 23, 2018,

---

[3] During one of these first few appointments, Jefferson remembers Dr. Asselmeier saying that Jefferson should wait for the rest of his teeth to go bad so he can receive dentures, but Jefferson admits this comment seemed like a joke (Doc. 87-1, p. 65).

[4] The first appointment with Dr. Wyshnytzky was also pushed back a week due to a Menard lockdown (Doc. 87-2, p. 3).

Jefferson signed a refusal to have teeth #5, #6, and #28 filled (Doc. 87-2, p. 5). To explain the refusal, Jefferson testified that he experienced an asthma attack the same day, which he prioritized over the dental appointment (Doc. 87-1, pp. 46-47, 61). Jefferson's dental records do not reflect any attempt to seek additional dental care through kite requests, nurse sick call, or grievances until the following year.

In January 2019, Jefferson filed a formal grievance to address his asthma, his broken teeth and associated pain, and to seek a dental appointment (Doc. 87-4, p. 1). In his first grievance, Jefferson did not specify the afflicted teeth or the affected area of his mouth (*Id.*). Reviewing the grievance, Dr. Asselmeier noted that Jefferson was already on the schedule to receive fillings and decided no further action was needed (*Id.* at p. 2). About a week after the first grievance, Jefferson filed another (*Id.* at p. 3). Jefferson reiterated that two of his teeth broke leading to severe pain that encumbered his ability to eat and sleep, and, again, he sought a dental appointment (*Id.*). He testified that the pain had become unbearable at this time[5] (Doc. 87-1, p. 52). Two weeks later, Jefferson submitted a third grievance, unaware of whether Dr. Asselmeier reviewed the prior grievances (Doc. 87-1, p. 53; Doc. 87-4, p. 4). In this grievance, Jefferson described his two broken teeth, with one now "broken beyond repair," along with his ongoing pain (Doc. 87-4, p. 4). Dr. Asselmeier reviewed this grievance and assumed an appointment to complete the fillings would adequately address Jefferson's complaints (*Id.* at p. 5).

---

[5] The grievance records are unclear as to whether Dr. Asselmeier received or responded to Jefferson's second grievance dated January 14, 2019.

Jefferson recognized that he failed to mention some of his dental issues with specificity in his grievances and that, in some respects, he did not accurately convey the dire condition of his teeth (Doc. 87-1, pp. 56-57).

The following week, on February 4, 2019, Jefferson finally saw Dr. Asselmeier (Doc. 87-2, p. 5; Doc. 53-2, ¶ 19). At the appointment, Dr. Asselmeier took an x-ray of tooth #28 (a tooth slated to be filled), placed a permanent filling on portions of #9, placed a temporary filling on #28, and removed some, but not all, of the decay in #28 (*Id.*). Dr. Asselmeier assessed #28 as non-restorable (*Id.*). The dental records indicate that Jefferson was provided pain medication and an antibiotic and was instructed to write if he wanted #28 fully extracted[6] (*Id.*). As next steps, Dr. Asselmeier noted that the lower left second bicuspid (#20) would be filled with a metal filling during the next visit and the lower right second bicuspid (#29) would be added to the filling list. (*Id.*). Dr. Asselmeier also recorded that he found no surface decay on #5, #6, and the upper left lateral incisor (#10) (*Id.*).

A month after this appointment, Jefferson chronicled his dissatisfaction in another grievance dated March 3, 2019 (Doc. 87-4, pp. 6-7). Jefferson described his teeth as "destroyed" (*Id.*). In the grievance, Jefferson lamented that one of his temporary fillings fell out several weeks prior, that he experienced ongoing pain interrupting his sleep and ability to eat, and that Dr. Asselmeier refused to remove the afflicted teeth, and instead, removed

---

[6] Dr. Asselmeier testified that a non-restorable tooth cannot be filled, and while it can be extracted, if it does not cause the patient pain, it could also be left alone (Doc. 87-3, p. 62).

two unaffected teeth (*Id.*). Upon review, Dr. Asselmeier explained that the dental unit had received zero kite requests from Jefferson since September 25, 2018, despite instructing him to submit such a request if he encountered dental pain or issues (*Id.* at p. 8). Dr. Asselmeier also recounted the recent treatment and, again, instructed Jefferson to submit kite requests to the dental unit for treatment[7] (*Id.*). At the end of March 2019, Dr. Wyshnytzky extracted tooth #28 after obtaining Jefferson's consent (Doc. 87-2, p. 5). Jefferson received post-operation instructions and pain medication (*Id.*). Dr. Wyshnytzky noted that tooth #20 would be filled at the next appointment (*Id.*).

At Menard, despite being seen several times by medical staff, Jefferson did not speak with any doctors or nurses during sick call regarding the pain in his teeth or the trouble eating associated with his pain (Doc. 87-1, p. 67). According to Jefferson, he informed Dr. Asselmeier and Dr. Wyshnytzky on several separate occasions that two specific teeth bothered him, but both dentists refused to record the complaints or inspect the teeth (Doc. 87-1, pp. 24, 67-68).

Upon his transfer the next month, the Lawrence dental unit reviewed Jefferson's chart (*Id.*). Jefferson testified that he did not complain to the Lawrence dental unit because he had "given up on IDOC dentistry at that time" (Doc. 87-1, p. 69). Sometime during that summer at Lawrence, Jefferson broke an aching tooth with his own hands, which he later identified as tooth #16 (Doc. 87-1, pp. 74-76). Months later, in September 2019,

---

[7] In this grievance review, dated March 5, 2019, Dr. Asselmeier states that Jefferson was placed back on the filling list on September 25, 2018, after refusing his original appointment (Doc. 87-4, p. 8). The cause of the lengthy waiting period for a filling at Menard is unclear, but there is no allegation against Dr. Asselmeier for causing this delay.

Jefferson missed his routine two-year dental examination (Doc. 87-2, p. 5). The appointment was rescheduled for the next week, and Jefferson eventually met with non-party dentist Dr. Mark Litherland (Doc. 87-2, p. 5; Doc. 87-6, p. 33). Dr. Litherland noted that teeth #12 and #16 appeared severely decayed and non-restorable, and he decided to schedule Jefferson for an x-ray and an extraction of those teeth (*Id.*). The dental records, along with Dr. Litherland's deposition testimony, indicate that Jefferson did not complain about teeth #12 and #16, rather, Dr. Litherland observed the decay on his own during examination (Doc. 87-2, p. 5; Doc. 87-6, pp. 34-35). Jefferson testified, however, that he told Dr. Litherland about teeth #12 and #16 (Doc. 87-1, p. 72). The actual extraction of teeth #12 and #16 occurred on October 8, 2019, after performing x-rays and obtaining Jefferson's consent (Doc. 87-2, p. 5; Doc. 87-6, p. 38). Jefferson's pain subsided after the removal (Doc. 87-1, pp. 74, 81-82). Days prior to removal, on October 3, 2019, Jefferson filed the Complaint in this action (Doc. 1).

LEGAL STANDARD

## I.   <u>Summary Judgment</u>

Summary judgment is proper only if the moving party can demonstrate that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Ruffin Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The moving party bears the burden of establishing that no material facts are in genuine dispute; any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *see also Lawrence v.*

*Kenosha Cty.*, 391 F.3d 837, 841 (7th Cir. 2004).

Once the moving party sets forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp.*, 477 U.S. at 322-24. A moving party is entitled to judgment as a matter of law where the nonmoving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp.*, 477 U.S. at 323. The party opposing summary judgment must offer admissible evidence in support of his version of events; hearsay evidence does not create a genuine issue of material fact. *Durling v. Menard, Inc.*, No. 18 C 4052, 2020 WL 996520, at *2 (N.D. Ill. Mar. 2, 2020) (citing *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 484 (7th Cir. 1996)). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the nonmovant. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[i]nferences that rely upon speculation or conjecture are insufficient." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (citation omitted).

## II.    Eighth Amendment Deliberate Indifference to Medical Needs

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A prisoner is entitled to "reasonable

measures to meet a substantial risk of serious harm"—not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). A prisoner's dissatisfaction with a medical professional's prescribed course of treatment does not give rise to a successful deliberate indifference claim unless the treatment is so "blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition *Machicote v. Roethlisberger*, 969 F.3d 822, 828 (7th Cir. 2020) (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)). "[T]he Eighth Amendment does not reach disputes concerning the exercise of a professional's medical judgment, such as disagreement over whether one course of treatment is preferable to another." *Cesal v. Moats*, 851 F.3d 714, 721 (7th Cir. 2017).

To succeed on a claim of deliberate indifference, a plaintiff must show: (1) that he suffered from an objectively serious medical condition; and (2) that the individual defendant was deliberately indifferent to that condition. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (citing *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006)).

A medical condition is objectively serious if "a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (quoting *Pyles*, 771 F.3d at 409) (internal quotation marks omitted).

Prevailing on the second prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to prisoner health. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). A plaintiff need not show the individual "literally ignored" his complaint, but that the individual was aware of the condition and

either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something more than negligence or even malpractice is required" to prove deliberate indifference. *Pyles*, 771 F.3d at 409; *see also Hammond v. Rector*, 123 F. Supp. 3d 1076, 1086 (S.D. Ill. 2015) ("isolated occurrences of deficient medical treatment are generally insufficient to establish . . . deliberate indifference"). Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry*, 604 F.3d at 440 (citing *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). This is in contrast to a case "where evidence exists that the defendant [ ] knew better than to make the medical decision[ ] that [he] did." *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016)) (alterations in original). A medical professional's choice of an easier, less efficacious treatment can rise to the level of violating the Eighth Amendment, however, where the treatment is known to be ineffective but is chosen anyway. *Berry*, 604 F.3d at 441. A delay in treating a non-life-threatening but painful condition may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged the prisoner's pain. *Arnett,* 658 F.3d at 753 (citing *McGowan v. Hulick,* 612 F.3d 636, 640 (7th Cir. 2010)).

## ANALYSIS

Jefferson contends that he made repeated complaints to Dr. Asselmeier regarding teeth #12 and #16, which were ultimately ignored. To substantiate his claim of deliberate

indifference, Jefferson must show that he suffered from an objectively serious medical condition and that Dr. Asselmeier was deliberately indifferent to that condition—that is, Dr. Asselmeier knew of, and consciously disregarded, an excessive risk to Jefferson's health.

In his motion for summary judgment, Dr. Asselmeier first argues that Jefferson did not have a serious dental need. While acknowledging that decayed or cracked teeth can constitute serious dental needs, Dr. Asselmeier states that Jefferson has failed to show that his personal dental condition qualified as such. In support of this argument, Dr. Asselmeier relies on Dr. Litherland's testimony that he could not definitively determine how quickly Jefferson's teeth evolved to a non-restorable state, and further, that obviously teeth #12 and #16 did not present an emergent issue or signal infection. This diagnosis, according to Dr. Asselmeier, demonstrates that no serious dental need existed.

Alternatively, Jefferson testified that he experienced severe pain from two cracked teeth. Jefferson's three grievances from January 2019 described pain, trouble eating, and headaches, which he attributed to teeth #12 and #16. Jefferson argues that the pain, resulting from untreated dental issues, qualifies as a serious medical condition.

Principally, the Seventh Circuit recognizes dental care as one of the most important medical needs of prisoners. *Board v. Farnham,* 394 F.3d 469, 480 (7th Cir. 2005). The pain stemming from dental issues that Jefferson described in his grievances, and testified about in his deposition, could certainly qualify as a serious medical condition. This self-reported pain along with Dr. Litherland's observation—albeit several months later and after Jefferson broke his own tooth—that teeth #12 and #16 were decayed, non-

restorable, and an issue worth attention could demonstrate Jefferson suffered a serious medical condition.

As to the next prong of deliberate indifference analysis, according to Dr. Asselmeier, Jefferson cannot show that any dentist at Menard had actual knowledge of his complaints regarding teeth #12 or #16. Dr. Asselmeier contends that Jefferson's grievances did not alert him to an issue with teeth #12 or #16, through specificity or by general description of the affected area. Further, Dr. Asselmeier asserts that, as is his custom and practice, he records complaints from patients in their dental records, and Jefferson's record is devoid of any such note, as well as any kite request or sick call documentation related to ongoing pain.

As to this point, Jefferson highlights his deposition testimony that he complained to Dr. Asselmeier and Dr. Wyshnytzky on multiple occasions that two teeth on the left side of his mouth were cracked which caused pain and trouble eating, but both dentists refused to record the complaints. Jefferson also leans on his grievances, three from January 2019 and one from March 2019, to demonstrate his ongoing and worsening dental condition and symptoms.

Notably, the dental records, along with the lack of kite requests and sick call notes, refute Jefferson's contention. Jefferson admitted that he did not report the pain or dental issues to sick call during his time at Menard (or after his transfer to Lawrence, despite having access to a new dental unit). Moreover, his grievances came ten months after his last appointment with Dr. Asselmeier. Jefferson claims that he told three separate dentists, Dr. Asselmeier and Dr. Wyshnytzky at Menard and Dr. Litherland at Lawrence,

about teeth #12 and #16, yet none of them documented these complaints. The only evidence in the record that supports Jefferson's contention is his deposition testimony that he persisted in these complaints and Dr. Asselmeier refused to record them.

The Court agrees with Dr. Asselmeier that the grievances alone are not sufficient to demonstrate actual knowledge. First, Dr. Asselmeier last met Jefferson in March 2018 before the grievances began in January 2019, with no record of kite requests or sick call notes in the meantime. The grievances do not reference specific teeth, which is certainly expected for a layperson untrained in dentistry, but they are also devoid of any general description of the area causing pain. From the grievances, Dr. Asselmeier became aware of Jefferson's pain but assumed that the present treatment plan, to fill several teeth, would adequately address the pain based on the information he received in the grievance. He did not have actual knowledge of any issues with teeth #12 or #16, or a general area of Jefferson's mouth, from these grievances alone. But Jefferson's testimony that he repeatedly complained specifically about teeth #12 and #16 directly to Dr. Asselmeier, who purportedly refused to document the complaints, paired with the limited nature of the available dental records, could demonstrate that Dr. Asselmeier had actual knowledge of Jefferson's issues with these teeth. On summary judgment, the Court cannot make a credibility determination and makes all inferences from the evidence, including deposition testimony, in favor of the nonmovant, Jefferson. Because of the minimal dental records, Jefferson's testimony could create a genuine issue of fact as to this element of his claim.

Prevailing on the second prong, however, requires Jefferson to show not only that Dr. Asselmeier knew of a serious risk to Jefferson's health but also that Dr. Asselmeier consciously disregarded it. This element is at the heart of the issue of constitutional adequacy in healthcare. Jefferson claims that Dr. Asselmeier literally ignored his complaints by continuously straying away from the problem, failing to address his major concern, and only discussing other teeth. Jefferson argues that Dr. Asselmeier mistakenly focused on other, unaffected teeth and caused him to lose teeth that did not cause any pain or issues. But the dental record indicates that Dr. Asselmeier evaluated the entire state of Jefferson's oral health on multiple occasions and developed a course of treatment to address Jefferson's dental needs.

While Jefferson testified that Dr. Asselmeier strayed away from the problem, that is his own medical assessment of the condition of his teeth. Across the five appointments with Jefferson, Dr. Asselmeier chose a course of treatment to best address the most pertinent issues in his medical judgment. Over the 15 months that Jefferson resided at Menard, Dr. Asselmeier conducted a preliminary review of his chart, provided treatment on five occasions, and reviewed at least three of Jefferson's grievances. In the first visit, Dr. Asselmeier examined Jefferson's teeth and decided that several needed fillings and two required extraction. In the second visit, Dr. Asselmeier performed the two extractions and provided Jefferson with pain medications, antibiotics, and instructions to write a kite request if he experienced pain. In the third appointment, Dr. Asselmeier followed up on the extractions and provided medications and antibiotics. In the fourth appointment, Dr. Asselmeier performed a second follow-up regarding the recent extractions, assessed that

healing progression fell within normal limits, and provided more medication. Finally, in the fifth appointment, Dr. Asselmeier took an x-ray, placed a temporary filling, and provided medication and antibiotics.

To survive summary judgment, Jefferson must present evidence that, in pursuing this course of treatment, Dr. Asselmeier's medical judgment fell "so far afield of accepted professional standards as to raise the inference that it was not actually based on medical judgment." *Whiting*, 839 F.3d at 664 (quoting *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006)). Markedly, Dr. Asselmeier's treatment plan overlapped with the prior evaluation by a non-party dentist prior to Jefferson's stint at Menard, such as filling #7 and extracting #17 and #18. Even though from Jefferson's perspective these other teeth should not have been the priority in his dental care, another independent dentist also determined that these teeth required attention. Dr. Asselmeier prioritized treating these teeth, along with filling #5, #7, and #9, as he did not observe cracks in teeth #12 and #16. Moreover, Dr. Litherland, the dentist who eventually extracted #12 and #16 several months after Jefferson's last visit with Dr. Asselmeier, testified that the teeth were not infected and did not present an emergent issue. It also stands to reason that the condition of Jefferson's teeth likely worsened by the time he saw Dr. Litherland, as several months had passed. According to Jefferson, he broke #16 himself after he transferred to Lawrence, which could have made the cracks and breaks more visible and in need of much more immediate repair than when Dr. Asselmeier evaluated the teeth.

Dr. Asselmeier may have failed to recognize and diagnose the cracks in Jefferson's teeth during examination, but even so, that would demonstrate only negligence. To

substantiate a claim of deliberate difference, and create a triable issue, something more than negligence or even malpractice is required. *See Pyles*, 771 F.3d at 409. Even if Dr. Asselmeier negligently failed to diagnose the cracked teeth and he knew of Jefferson's complaints about #12 and #16, Dr. Asselmeier provided pain medication on four of the five appointments with Jefferson. No reasonable juror could infer that Dr. Asselmeier ignored Jefferson's complaints of pain when pain medication was prescribed after all but the first appointment. Moreover, with a primary complaint of pain, Dr. Asselmeier cannot be faulted for not construing Jefferson's complaint as urgent when Jefferson abandoned his filling appointment, chose not to alert other medical staff of his pain via sick call, and failed to submit kite requests (even though, the time he did write a kite request after the extraction of #17 and #18, Jefferson received a dental appointment the next week). *See Munson v. Newbold,* --- F.4th ----, 2022 WL 3593762, at * 3 (7th Cir. Aug. 23, 2022). Furthermore, if Jefferson argues that Dr. Asselmeier wrongfully chose a treatment plan of pain medication instead of extracting #12 and #16, Jefferson only demonstrates a disagreement in the proper course of care, not a reckless disregard for his wellbeing. A prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm" — not to demand specific care. *Forbes*, 112 F.3d at 267.

If Jefferson also argues that Dr. Asselmeier delayed his dental care leading to worsening pain, this argument is also not supported by the record. Jefferson delayed his own dental treatment by refusing his filling appointment in September 2018. Moreover, he did not request help via kite requests or sick call, which would bring emergent issues to the dental unit's attention. Delays in medical care, here, occurred due to lockdowns,

Jefferson's filling appointment refusal (even if he had an understandable reason for doing so), waiting to initiate the grievance process until ten months after his last appointment with Dr. Asselmeier, not requesting emergent care, not submitting kite requests, and not reporting dental pain in sick call or other routine medical visits.

To the extent that Jefferson argues that his lack of pain after the extraction of #12 and #16 at Lawrence demonstrates that Dr. Asselmeier should have extracted the teeth long before, the Court disagrees. Dr. Asselmeier appears to have used his medical judgment to treat Jefferson's dental needs. Jefferson offers no evidence that the treatment pursued by Dr. Asselmeier was unreasonable and departed from acceptable professional judgment. Moreover, Dr. Litherland testified that the issues with #12 and #16 were worth attention but not emergent, even after several months passing and Jefferson attempting to extract his own tooth.

On this record, no reasonable jury could find that Dr. Asselmeier was deliberately indifferent to Jefferson's serious dental need or associated pain, that he demonstrated intentional or criminally reckless conduct, or that his medical decisions substantially departed from accepted professional judgment. Jefferson has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof—that Dr. Asselmeier disregarded a serious risk to Jefferson's health demonstrating deliberate indifference. Accordingly, Dr. Asselmeier is entitled to summary judgment.

## CONCLUSION

For these reasons, the motion for summary judgment filed by Defendant Dr. Asselmeier (Doc. 86) is **GRANTED**. The Clerk of Court is **DIRECTED** to enter judgment

accordingly and close this case.

**IT IS SO ORDERED.**

**DATED:  September 12, 2022**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**